JUDGE SCHEINDLIN

**'07 CIV 7616**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

MACROMEX Srl,

                 Petitioner,

    -against-

GLOBEX INTERNATIONAL INC.,

                 Respondent.
-----------------------------------------------------X

**PETITION TO CONFIRM
ARBITRATION AWARD**



RECEIVED
AUG 2 7 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Pursuant to 9 U.S.C. § 9, the Petition of MACROMEX Srl respectfully shows:

1.     MACROMEX Srl ("MACROMEX") was and now is a corporation organized and existing under and by virtue of the laws of Romania, with an office and principal place of business in Bucharest, Romania. MACROMEX is engaged in business as an importer of poultry, <u>inter alia</u>.

2.     GLOBEX INTERNATIONAL INC. ("GLOBEX") was and now is a corporation organized and existing under and by virtue of the laws of the State of New York, with an office and principal place of business at 515 Madison Avenue, New York, New York. GLOBEX does business in the State of New York and is engaged in business as an exporter of poultry, <u>inter alia</u>.

3.     On or about April 14, 2006, MACROMEX and GLOBEX entered into four (4) contracts for the purchase and sale of chicken leg quarters. Copies of said contracts are attached hereto as Exhibit A.

4.     Said contracts provided, <u>inter alia</u>:

         All disputes in connection with the contract or the execution thereof shall be settled by amicable negotiations. In case no settlement can be reached, the case under dispute can then be submitted to AAA (American Arbitration Association) in New

York for arbitration. The arbitration shall be executed in accordance with the Provisional Rules of the Said council and the decision made by the council shall be accepted as final and binding upon both parties. The fees for arbitration shall be borne by the losing party unless otherwise awarded.

5.     Thereafter, in June of 2006, a dispute arose between the parties under the said contracts, with MACROMEX claiming a breach by reason of non-delivery of some of the chicken leg quarters due under the contracts and GLOBEX claiming that its contractual performance was excused by reason of force majeure. MACROMEX sought the sum of $608,323.00, plus interest, costs and fees as damages.

6.     Pursuant to the contracts' arbitration agreement as quoted in paragraph 4, supra, MACROMEX and GLOBEX submitted the said dispute to arbitration in New York before the AAA's International Center for Dispute Resolution. Philip D. O'Neill, Jr., Esq. was appointed as Sole Arbitrator.

7.     Thereafter, on June 4, 5 and 6, 2007, the Sole Arbitrator held hearings in New York, New York and heard testimony and received documentary evidence. Following said hearings, Briefs and Reply Briefs were submitted and exchanged by each party.

8.     Having considered the parties' evidence and Briefs and Reply Briefs, the Sole Arbitrator then made and entered a written award in New York, New York dated August 7, 2007, which upheld MACROMEX' claim in full and awarded damages to MACROMEX in the sum of $608,323.00 plus interest and costs (including reasonable attorneys fees) deferring only a decision on the ancillary issues of the applicable rate of interest and allocation of costs. A copy of said written award is attached hereto as Exhibit B.

WHEREUPON Petitioner MACROMEX Srl moves this Honorable Court for an Order confirming said award and directing that judgment be entered thereon and that petitioner be

allowed the costs of this proceeding including reasonable attorneys' fees and that petitioner

have such other, further ad different relief as to this Court may seem just and proper.

Dated: New York, New York
      August 27, 2007

                         NICOLETTI HORNIG & SWEENEY
                         Attorneys for Macromex Srl

                By:

                      James F. Sweeney (JFS-7745)
                      Wall Street Plaza
                      88 Pine Street, 7th Floor
                      New York, New York 10005-1801
                      (212) 220-3830
                      (Our File No.:  00000717 JFS)

TO:

Stanley McDermott, Esq.
Sarah Sterken, Esq.
DLA Piper US LLP
1251 Avenue of the Americas
New York, New York 10020

Globex International, Inc.
515 Madison Avenue
New York, New York  10022

**Exhibit A**



# GLOBEX INTERNATIONAL, INC.

515 MADISON AVE., 38TH FLOOR
NEW YORK, N.Y. 10022

TEL. (212) 308-2300
FAX (212) 308-0202

## ORDER CONFIRMATION / SALES CONTRACT     No. 38268-38297

Date:     April 14, 2006

| Sold To: Macromex SRL | Ship To: Macromex SRL |
|---|---|
| 89 Eroll Sanitari Av.<br>Bucharest 5, Romania<br>Fax: 40 21 411 9136 | 27 Mihai Eminescu St,<br>Bucharest, 010513 Romania |

| Item No. | Product | Weight | Price/$ | Per | Amount/$ |
|---|---|---|---|---|---|
| 14015 | CHICKEN LEG QUARTERS,15 KG, BULK PACKED | 810,000.00 | 0.535 | KG | 433,350.00 |
| | | | | **TOTAL USD:** | **433,350.00** |

Origin: USA

Shipment Date: 4/24/06 +/- 2 weeks

Delivery Terms: CIF CONSTANTA, ROMANIA

Payment Terms: CASH AGAINST DOCUMENTS

Bank Credentials:  NORTH FORK BANK, 845 3rd Avenue, New York, NY 10022. ABA 021407912. Account name: Globex International, Inc., Account# 2654045933

Other Conditions:
- All payments made under this Sales Contract are non-refundable and shall be forfeited should the Buyer fail to make subsequent payments.
- Non compliance with the terms of this Contract may result in Seller having the option to cancel the entire Contract without any remaining obligation.
- Buyer should provide the Seller the name and address of consignee(s) as it to appear on Ocean Bill of Lading and Certificates as well as Notify name and address on Ocean Bill of Lading not later than 5 days prior the shipment.
- No claim made later than 2 days after the product arrival will be accepted. Globex reserves the right to request an independent survey(SGS) when evaluating a claim.
- All disputes in connection with this contract or the execution thereof shall be settled by amicable negotiations. In case no settlement can be reached, the case under dispute can then be submitted to AAA (American Arbitration Association) in New York for arbitration. The arbitration shall be executed in accordance with the Provisional Rules of the said council and the decision made by the council shall be accepted as final and binding upon both parties. The fees for arbitration shall be borne by the losing party unless otherwise awarded.

| GLOBEX INTERNATIONAL INC.<br>515 MADISON AVE, 38TH FL<br>NEW YORK, NY 10022<br><br>Globex International, Inc. | I hereby confirm acceptance of this order.<br><br>Please sign and return signed copy via fax<br>To (212) 308-0202 |
|---|---|



# GLOBEX INTERNATIONAL, INC.

515 MADISON AVE., 38TH FLOOR
NEW YORK, N.Y. 10022

TEL. (212) 308-2300
FAX (212) 308-0202

## ORDER CONFIRMATION / SALES CONTRACT     No.  38298-38327

Date:    April 14, 2006

| Sold To: | Macromex SRL<br>89 Eroii Sanitari Av.<br>Bucharest 5, Romania<br>Fax: 40 21 411 9136 | Ship To: | Macromex SRL<br>27 Mihai Eminescu St.<br>Bucharest, 010513 Romania |
|---|---|---|---|

| Item No. | Product | Weight | Price/$ | Per | Amount/$ |
|---|---|---|---|---|---|
| 14015 | CHICKEN LEG QUARTERS,15 KG, BULK PACKED | 810,000.00 | 0.535 | KG | 433,350.00 |
| | | | | **TOTAL USD:** | **433,350.00** |

Origin: USA

Shipment Date: 5/1/06 +/- 2 weeks

Delivery Terms: CIF CONSTANTA, ROMANIA

Payment Terms: CASH AGAINST DOCUMENTS

Bank Credentials:  NORTH FORK BANK, 845 3rd Avenue, New York, NY 10022, ABA 021407912, Account name:
Globex International, Inc., Account# 2854045933

Other Conditions:
- All payments made under this Sales Contract are non-refundable and shall be forfeited should the Buyer fail to make subsequent payments.
- Non compliance with the terms of this Contract may result in Seller having the option to cancel the entire Contract without any remaining obligation.
- Buyer should provide the Seller the name and address of consignee(s) as it to appear on Ocean Bill of Lading and Certificates as well as Notify name and address on Ocean Bill of Lading not later than 5 days prior the shipment.
- No claim made later than 2 days after the product arrival will be accepted. Globex reserves the right to request an independent survey(SGS) when evaluating a claim.
- All disputes in connection with this contract or the execution thereof shall be settled by amicable negotiations.  In case no settlement can be reached, the case under dispute can then be submitted to AAA (American Arbitration Association) in New York for arbitration.  The arbitration shall be executed in accordance with the Provisional Rules of the Said council and the decision made by the council shall be accepted as final and binding upon both parties.  The fees for arbitration shall be borne by the losing party unless otherwise awarded.

| GLOBEX INTERNATIONAL INC.<br>515 MADISON AVE., 38TH FL<br>Globex International Inc., NY<br>NEW YORK, NY 10022 | I hereby confirm acceptance of this order.<br><br>Please sign and return signed copy via fax<br>To (212) 308-0202 |
|---|---|



# GLOBEX INTERNATIONAL, INC.

515 MADISON AVE., 38TH FLOOR
NEW YORK, N.Y. 10022

TEL (212) 308-2300
FAX (212) 308-0202

## ORDER CONFIRMATION / SALES CONTRACT    No.  38328-38353

Date:    April 14, 2006

| Sold To: | Macromex SRL<br>89 Eroil Sanitari Av.<br>Bucharest 5, Romania<br>Fax: 40 21 411 9136 | Ship To: | Macromex SRL<br>27 Mihai Eminescu St.<br>Bucharest, 010513 Romania |
|---|---|---|---|

| Item No. | Product | Weight | Price/$ | Per | Amount/$ |
|---|---|---|---|---|---|
| 14015 | CHICKEN LEG QUARTERS,15 KG, BULK PACKED | 702,000.00 | 0.535 | KG | 375,570.00 |
| | | | | **TOTAL USD:** | **375,570.00** |

Origin: USA

Shipment Date: 5/8/06 +/- 2 weeks

Delivery Terms: CIF CONSTANTA, ROMANIA

Payment Terms: CASH AGAINST DOCUMENTS

Bank Credentials:   NORTH FORK BANK, 845 3rd Avenue, New York, NY 10022, ABA 021407912, Account name:
Globex International, Inc., Account# 2854045933

Other Conditions:
- All payments made under this Sales Contract are non-refundable and shall be forfeited should the Buyer fail to make subsequent payments.
- Non compliance with the terms of this Contract may result in Seller having the option to cancel the entire Contract without any remaining obligation.
- Buyer should provide the Seller the name and address of consignee(s) as it to appear on Ocean Bill of Lading and Certificates as well as Notify name and address on Ocean Bill of Lading not later than 5 days prior the shipment.
- No claim made later than 2 days after the product arrival will be accepted. Globex reserves the right to request an independent survey(SGS) when evaluating a claim.
- All disputes in connection with this contract or the execution thereof shall be settled by amicable negotiations. In case no settlement can be reached, the case under dispute can then be submitted to AAA (American Arbitration Association) in New York for arbitration. The arbitration shall be executed in accordance with the Provisional Rules of the Said council and the decision made by the council shall be accepted as final and binding upon both parties. The fees for arbitration shall be borne by the losing party unless otherwise awarded.

| GLOBEX INTERNATIONAL INC.<br>515 MADISON AVE, 38TH FL<br>Globex International NY 10022 | I hereby confirm acceptance of this order.<br><br>_____<br>Please sign and return signed copy via fax<br>To (212) 308-0202 |
|---|---|

CONFIDENTIAL



# GLOBEX INTERNATIONAL, INC.

515 MADISON AVE., 38TH FLOOR
NEW YORK, N.Y. 10022

TEL. (212) 308-2300
FAX (212) 308-0202

## ORDER CONFIRMATION / SALES CONTRACT

No. 38354-38379

Date: April 14, 2006

| Sold To: | Macromex SRL<br>89 Eroii Sanitari Av.<br>Bucharest 5, Romania<br>Fax: 40 21 411 9136 | Ship To: | Macromex SRL<br>27 Mihai Eminescu St.<br>Bucharest, 010513 Romania |
|---|---|---|---|

| Item No. | Product | Weight | Price/$ | Per | Amount/$ |
|---|---|---|---|---|---|
| 14015 | CHICKEN LEG QUARTERS,15 KG, BULK PACKED | 702,000.00 | 0.535 | KG | 375,570.00 |
| | | | | **TOTAL USD:** | **375,570.00** |

Origin: USA

Shipment Date: 5/15/06 +/- 2 weeks

Delivery Terms: CIF CONSTANTA, ROMANIA

Payment Terms: CASH AGAINST DOCUMENTS

Bank Credentials:   NORTH FORK BANK, 845 3rd Avenue, New York, NY 10022, ABA 021407912, Account name: Globex International, Inc., Account# 2854045933

Other Conditions:
- All payments made under this Sales Contract are non-refundable and shall be forfeited should the Buyer fail to make subsequent payments.
- Non compliance with the terms of this Contract may result in Seller having the option to cancel the entire Contract without any remaining obligation.
- Buyer should provide the Seller the name and address of consignee(s) as it to appear on Ocean Bill of Lading and Certificates as well as Notify name and address on Ocean Bill of Lading not later than 5 days prior the shipment.
- No claim made later than 2 days after the product arrival will be accepted. Globex reserves the right to request an independent survey(SGS) when evaluating a claim.
- All disputes in connection with this contract or the execution thereof shall be settled by amicable negotiations. In case no settlement can be reached, the case under dispute can then be submitted to AAA (American Arbitration Association) in New York for arbitration. The arbitration shall be executed in accordance with the Provisional Rules of the said council and the decision made by the council shall be accepted as final and binding upon both parties. The fees for arbitration shall be borne by the losing party unless otherwise awarded.

| GLOBEX INTERNATIONAL INC.<br>515 MADISON AVE, 38TH FL<br>NEW YORK, NY 10022<br>Globex International, Inc. | I hereby confirm acceptance of this order.<br><br>Please sign and return signed copy via fax<br>To (212) 308-0202 |
|---|---|

GLOBEX   000006

**Exhibit B**

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

| | | |
|---|---|---|
| MACROMEX Srl. | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| vs - | ) | Case No. 50 181 T 00364 06 |
| | ) | |
| GLOBEX INTERNATIONAL INC. | ) | |
| Respondent | ) | |

## INTERIM AWARD

I, the Undersigned Arbitrator, having been designated by the International Centre for Dispute Resolution ("ICDR") pursuant to an arbitration clause contained in each of the purchase orders dated April 14, 2006 (the "Contracts") between the above-noted parties; having been duly sworn; and having duly heard the allegations, proofs and argument of the parties; do hereby award on an interim basis as follows with respect to the issues arising in this proceeding:

### I. FACTS

Globex International ("Seller") is an American company engaged in the export of food products to multiple countries globally, including in Eastern Europe. Seller has contracts containing exclusivity agreements with companies in certain locales. In the ordinary course of business Seller developed a non-exclusive relationship with Macromex SRL ("Buyer"), a Romanian company, and agreed to ship, among other things, chicken leg quarters to Buyer.

The Contracts in question involved order confirmation/sales agreements dated April 14, 2006 for chicken leg quarters to be shipped to Buyer, which had an address in Bucharest, Romania. The shipment dates were expressly established in each order as follows:

| No. 38268-38297: | 4/24/06 +/- 2 weeks |
|---|---|
| No. 38298-30297: | 5/1/06 +/- 2 weeks |
| No. 38328-38353: | 5/8/06 +/- 2 weeks |
| No. 38354-38379: | 5/15/06 +/- 2 weeks |

As such, all product was to be shipped no later than May 29, 2006. No particular supplier of the chicken products was specified in the Contracts. The Contracts are governed by the U. N. Convention on International Sale of Goods ("CISG").

Evidence at hearing established that in the normal course of dealing within the industry, as well as between the two parties to this proceeding, some flexibility in delivery was allowed at times, albeit with industry players utilizing somewhat different (rather than uniform) purchase order language on shipment terms. After the conclusion of the Contracts between the parties, the price of chicken increased very substantially, and Seller's supplier failed to ship to it in a timely

manner. Seller impacted this supply situation – unknowingly perhaps, at least initially – by allocating such product to two breakbulk shipments for itself, rather than to container sales for customers like Buyer. While Buyer did become more insistent regarding prompt delivery as the month of May progressed, Buyer did not formally claim breach; nor did Buyer set another delivery date prior to the issuance of a decree by the Romanian government, which established a chicken product importation ban with virtually no notice.

To explain, an avian flu outbreak prompted the Romanian government to bar all chicken imports not certified as of June 7, 2006. The Romanian Bulletin addressing the restriction stated that: "Transports loaded within 5 days of June 2, 2006 will be allowed to be imported into Romania." An extension of one day was subsequently granted. Had Seller loaded the chicken within the two week window expressly provided for in the Contracts, or even within a week thereafter, the chicken would have been allowed into Romania. However, Seller was unable to certify all the remaining chicken in the order in time, so the final delivery was deficient. Buyer then proposed that Seller ship the balance of the chicken order to it at a location outside of Romania, suggesting certain ports. Another supplier to Buyer provided such alternative performance following implementation of the ban with respect to shipments on which it too was late. Seller ultimately refused the proposal, maintaining that the unfilled portions of the Contracts were voided by the Romanian government's action, which constituted a force majeure event. Seller thereafter sold the undelivered chicken to another buyer at a substantial profit. Buyer now seeks a damages remedy with respect to the undelivered product under the Contracts.

## II. THE MERITS AND APPLICABLE LAW

The facts of this case are less complicated than the applicable law. Seller's defense to the claim is grounded in a legal exemption provided by Article 79 of the CISG . Its ability to invoke the defense is dependent on whether the initial delay in delivery constituted a fundamental breach. This issue, in turn, potentially impacts whether Seller's tardiness under the Contracts prevents a finding that the governmental ban impediment caused the fundamental breach. The second basic legal issue is whether Buyer's proposed alternative of a different destination was a commercially reasonable alternative such that Seller was obligated to comply. This issue, in turn, is impacted by whether resort to private law, and specifically the UCC (to define what is "commercially reasonable" in the circumstances), is appropriate under Article 7(2) of the CISG. As explained below in detail, I hold in Buyer's favor and award damages, as the weightier facts and more persuasive precedent/scholarly commentary all support that result.

### A. Breach of Contract under the CISG

The CISG states that the "seller must deliver the goods . . . if a period of time is fixed by or determinable from the contract, at any time within that period." CISG Article 33. The goods delivered must be "of the quantity, quality and description required by the contract and . . . contained or packaged in the manner required by the contract." CISG Article 35. In the event that "seller delivers only a part of the goods . . . [buyer's rights] apply in respect [to] the part which is missing . . . ." CISG Art. 51(1).

It is also worth noting that the language of the CISG concerning damages is very broad: it states that: "[i]f the seller fails to perform *any* of his obligations under the contract or this Convention, the buyer may" either "exercise the rights provided in arts. 46-52;" or "claim damages as provided in arts. 74-77." CISG Art. 45(1) (emphasis added). However, there is

nothing in the Convention provisions to suggest that a failure to perform a minor contractual obligation would trigger the full amount of damages sought herein. While it is unclear on the existing record reflected in the evidentiary record what damages would be available for an immaterial breach if sought, it is clear that for the Buyer to be entitled to the full damages sought in this proceeding, the Seller would have to have been in fundamental breach of the Contracts.

Under a strict reading of the CISG provisions above and the language on the face of the Contracts, Seller breached the Contracts upon the expiration of the additional two weeks expressly granted in the Contracts beyond the fixed delivery date. The lapse in time between the contractual shipment periods and the Romanian government's blockage of imports was a matter of weeks or days, depending upon the particular Contract. However, this delay in performance did not amount to a fundamental breach for several reasons. As explained below, first, the parties' prior course of dealing and industry practice allowed for some flexibility in the delivery date – a flexibility that was shown in Buyer's responses here, at least at the onset of the delivery delay. Second, the Buyer and Seller appear to have revised the contract as to shipment dates as a matter of law under the CISG, at least for a limited period, through their continued dealing, based on the email chains reflected in the evidentiary record. Third, even if the breach could have been considered fundamental, Buyer failed to notify Seller of Buyer's avoidance, which is legally significant as explained below.

While there is no "bright-line" rule for what constitutes a reasonable delay, if the delay was within the parties' and/or industry's definition of "reasonable" it would not be sufficient to find a fundamental breach under Article 49. *See Valero Marketing & Supply Co. v. Greeni Oy*, No. Civ. 01-5254 at *7-8, 2006 WL 891196 (D.N.J. Apr. 4, 2006) (finding two day delay did not amount to fundamental breach under Article 49 because it was reasonable within industry). Provided that the delay here was within the scope of the course of business of the Seller and Buyer and/or their industry, then Seller's actions could not be found to constitute a fundamental breach. However, the evidence does not permit a specific finding in this regard, as only general latitude was referenced in postponement practice testimony, rather than specific temporal parameters. The absence of specificity cuts against the Seller since it is seeking to invoke it as an excuse, and therefore had the burden of proof on industry practice. At the same time though, the parties behaved until June 2, 2006 – the date of the Romanian government ban – in a manner that did not rise to the level of Buyer either declaring or acting upon a fundamental breach.

Second, "[a] contract may be modified or terminated by the mere agreement of the parties." CISG Article 29(1). Modifications or terminations are only required to be in writing when the contract contains a provision requiring such. CISG Article 29(2). The failure to object to a unilateral attempt to modify a contract is not an agreement to modify a contract. *See Chateau des Charmes v. Sabate USA, Inc.*, 328 F.3d 528, 531 (9th Cir. 2003). However, "[f]ollowing arts. 29(1) and 11 CISG, any agreement, regardless of the form in which it came about, can in principle be changed or ended by the mere agreement of the parties, which may be proved by any means, including the behavior of the parties themselves." Belgium, 15 May 2002 Appellate Court Gent (*NV A.R. v. NV I.*) (*Design of radio phone case*) http://cisgw3.law.pace.edu/cases/020515b1.html (finding a "positive meaning attached in trade to silence when receiving all kinds of documents, correspondence and so on."). Here, Buyer acquiesced for a time to the shipment delay, albeit while pressing for action to be taken and status information provided by Seller.

Third, "according to Article 26 CISG, a contract is not avoided automatically when a fundamental breach of contract occurs; the Buyer must explicitly declare the avoidance." Evelien Visser, *Gaps in the CISG: In General and with Specific Emphasis on the Interpretation of the Remedial Provisions of the Convention in the Light of the General Principles of the CISG*, § 2.3 (1998) http://www.cisg.law.pace.edu/cisg/biblio/visser.html [hereinafter *Gaps in the CISG*]. There is nothing in the record to indicate that Buyer provided such notice, written or otherwise, to Seller of any intent to avoid the contract in the circumstances, which occurred during a steep increase in poultry prices in the global marketplace between April and June, 2006.

Finally, even if Seller were found liable for damages, Seller potentially could avoid this liability if the Romanian government's decision to block chicken imports constituted a force majeure event, such that Seller qualified for an "exemption" under CISG Article 79. Force majeure, of course, is an event or effect that can be neither anticipated nor controlled. The CISG codified an "exemption" in Article 79, which states in relevant part that:

> A party is not liable for a failure to perform any of his obligations
> if he proves that the failure was due to an impediment beyond his
> control and the he could not reasonably be expected to have taken
> the impediment into account at the time of the conclusion of the
> contract or to have avoided or overcome it or its consequences.

CISG Article 79. The term "exemption" was purposefully used in lieu of the more common term" force majeure" in an effort to avoid unintentional reference to private law. Catherine Kessedjian, *Competing Approaches to Force Majeure and Hardship*, in 25 INTERNATIONAL REVIEW OF LAW AND ECONOMICS 641, § 1.1.1. (Sept. 2005) *available at* http:www.cisg.law.pace.edu/cisg/biblio/kessedjian.html. Although the Contracts contained no "force majeure" clause, the CISG helps to fill the "gap" in the Contracts in this regard; there is no legal significance here to the differing practice of Seller evident in at least one of its agreements with another entity in the evidentiary record regarding inclusion of a force majeure clause.

Irrespective of whether Seller's delay prior to the Romanian government's ban on chicken imports constituted a fundamental breach, Seller's ultimate failure to deliver all of the contracted-for chicken would be a fundamental breach, unless Seller can claim the "exemption" under Article 79.

## B.  Qualification for an "Exemption" under the CISG

If successfully proven, an Article 79 "exemption" bars the party from "liability for failure to perform any of his obligations." CISG Article 79. "The effect . . . is to exempt the non-performing party only from liability for damages. All of the other remedies are available to the other party." Secretariat Commentary, Guide to CISG Article 79, §§ 7, 8. Article 79 only exempts from certain liabilities, and does not "address other types of relief, such as a buyer's right to reduction on price (Article 50), the right of compel performance [sic] (Articles 46, 62), the right to avoid the contract (Articles 49, 64), the right to collect interest (Article 78), or the right to collect penalties or liquidated damages if local law permits. Indeed, it specifically reserves a party's right to these remedies." Carla Spivack, *Of Shrinking Sweatsuits and Poison Vine Wax: A Comparison of Basis for Excuse under U.C.C. § 2-615 and CISG Article 79*, in 27

PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 757, 799 (Fall 2006) *available at* http://cisgw3.law.pace.edu/cisg/biblio/spivack.html [hereinafter *Of Shrinking Sweatsuits*].

Article 79 contains four factors a party must meet to qualify for the exemption. First, there must be "an impediment beyond the defaulting party's control." CISG Article 79; *see also* Chengwei Liu, *Force Majeure: Perspectives from the CISG, UNIDROIT Principles, PECL and Case Law*, § 4 (2d ed. Apr. 2005) *available at* http:www.cisg.law.pace.edu/cisg/biblio/liu6.html [hereinafter *Force Majeure*]. Second, the impediment "could not have been reasonably taken into account by the defaulting party at the conclusion of the contract." *Id.* Third, the impediment or the consequences of the impediment "could not have been reasonably avoided or overcome." *Id.* Fourth, the "defaulting party proves that the challenged non-performance was due to such an impediment." *Id.* The burden of proof is on the party failing to perform. Germany, 9 January 2002 Supreme Court (*Powdered milk case*) http://cisgw3.law.pace.edu/cases/020109g1.html.

The Romanian government's decision to stop all chicken imports on virtually no notice to the industry was certainly beyond Seller's control, and it would not have been reasonably contemplated as a risk assigned to the Seller at the conclusion of the contract, as no prior ban experienced by either party was taken as precipitously. The third and fourth factors are closer questions, and are addressed in greater detail below (in reverse order) because of their ultimate importance to the determination of the merits.

### i. Meeting the Fourth Factor of Causality

This requirement essentially requires a showing of causality between the impediment and the non-performance. "The non-performance of the contract must be 'due to' the impediment." Chengwei Liu, *Force Majeure* § 4. Causality exists here between Seller's inability to deliver the chicken and the Romanian government's ban on imports. The question is whether Seller's delay in performance beyond the shipment "window" expressly provided for in the Contracts and/or by industry practice bars the Seller from claiming protection of the exemption by precluding Seller's ability to show causation.

Two cases have addressed whether a party can claim an exemption under Article 79 when it is in breach of the terms of the contract. In one case where the Buyer was supposed to have paid for a caviar delivery prior to the imposition of U.N. sanctions that made payment impossible, the court held that when "Buyer was in default before the sanctions [the force majeure] became effective, he could have and should have paid at a date when payment was possible and his status of being a defaulting party cannot be changed by a later force majeure." Hungary, 10 December 1996 Budapest Arbitration Vb 96074 (*Caviar case*) http://cisgw3.law.pace.edu/cases/96121h1.html ("Buyer was supposed to pay US $15,000 before delivery, while the balance was due 'within two weeks after delivery.'"). A second court found that a party to a contract could not claim that a strike was an impediment because it occurred after the seller was already in arrears. Bulgaria, 24 April 1996 Arbitration Case 56/1995 (*Coal case*) http://cisgw3.law.pace.edu/cases/960424bu.html. However, these cases can be distinguished here since the Seller is found not to be in fundamental breach prior to the occurrence of the impediment, and no CISG case was found directly addressing a fact pattern involving immaterial breach.

Two scholarly approaches to access the ability of a seller to raise a force majeure exemption when the seller has already failed to perform some portion of the contractual

obligations are also available and to be considered. *Compare*, e.g., Denis Tallon, *Article 79*, *in*
COMMENTARY ON THE INTERNATIONAL SALES LAW: THE 1980 VIENNA SALE CONVENTION, 581-
82 (Bianca & Bonell, eds.) (Milan 1987) *available at*
http://www.cisg.law.pace.edu/cisg/biblio/talon-bb79.hml, *with* Chengwei Liu, *Force Majeure*
(citing ENDERLEIN & MASKOW, INTERNATIONAL SALES LAW: UNITED NATIONS CONVENTION ON
CONTRACTS FOR THE INTERNATIONAL SALE OF GOODS 322 (1992)). Tallon argues that "the
exempting event must necessarily be the exclusive cause of the failure to perform. If goods not
properly packaged are damaged following an unforeseeable and unavoidable accident, the seller
remains nonetheless liable . . . . The judge cannot reduce, even partly, the damages owed by the
seller on account of that latter accident. The loss is attributable to the seller's failure to provide
adequate accident-proof packaging." Denis Tallon, *Article 79*. Chengwei Liu adopts the position
of *Enderlein & Maskow*, that "on the contrary . . . 'it cannot be required that the impediment is
the exclusive cause of a breach of contract;' . . . the impediment should also be accepted *when a
cause overtakes another cause* . . . 'It is decisive . . . whether the impediment lastly has caused
the breach of contract. If this is so, it consumes other breaches of contract for which there are no
grounds for exemption insofar as those no longer appear independently." Chengwei Liu, *Force
Majeure* 4.6.

However, Chengwei Liu also stresses that "[t]he force majeure must have come about
without the fault of either party. There will be no excuse if an unforeseeable event impedes
performance of the contract when the event would not have affected the contract if the party had
not been late in performing." *Id.* Chengwei Liu goes on to state that it is a general rule that "a
change in circumstances will not be taken into account if it occurred during a delay in
performance of the person alleging application of the doctrine" due to the good faith
requirements of the CISG, and that when "the impediment occurs during the delay, its causality
for the breach of contract is given only if it had an effect in the case of delivery within the period
prescribed.'" Chengwei Liu, *Force Majeure*.

Seller has argued that its failure to ship the chicken within the time period set by the
contract did not constitute fundamental breach, and was within acceptable commercial norms of
the industry.  The logical implication is that it is distinguishable from the cases and commentary
above because the Romanian government's action overtook its prior minor breach. Seller's
argument may be frustrated, however, as the intent of this rule is that "[t]he obligor is always
responsible for impediments when he could have prevented them but, despite his control over
preparation, organization, and execution, failed to do so." Germany, 24 March 1999 Supreme
Court (*Vine wax case*) http://cisgw3.law.pace.edu/cases/990324g1.html. Still, the CISG case law
and commentary on it does not expressly address the issue of whether a seller in non-
fundamental breach is barred from proving causation when the impediment would not have
resulted in fundamental breach had the non-fundamental breach not occurred. As such,
persuasive precedent and related commentary is of limited import on this potentially dispositive
factor.

BOS_592507_1.DOC/PONEILL

### ii. Meeting the Third Factor that Impediment Could Not Reasonably Be Overcome

The remaining key legal issue is whether the Seller should have complied with the Buyer's proposed alternative shipment to a location outside of Romania. Article 79 states that party will be exempted from liability if it "could not reasonably be expected to . . . have avoided or overcome it or its consequences." Article 79(1). There is very little case law under Article 79 defining what the Secretariat Commentary to the CISG terms a "commercially reasonable substitute." Secretariat Commentary, Guide to CISG Article 79, § 7. As such, there is no clear answer to this question under the CISG. Given the paucity of CISG case law, it is necessary to draw from private law to explicate "commercially reasonable substitute" in the circumstances of this case; and I conclude I am able to do so under CISG Article 7(2).

### (a) Interpretation of CISG Provisions Generally

Material "for interpretation of the Convention . . . unless CISG expressly provides otherwise, [must] be taken from the convention itself . . . . CISG is not a law complementary to national laws but is meant to be an exhaustive regulation." Gyula Eorsi, *General Provisions*, in INTERNATIONAL SALES: THE UNITED NATIONS CONVENTION ON CONTRACTS FOR THE INTERNATIONAL SALE OF GOODS, 2-1 to 2-36 (Galston & Smit eds.) (1984), *available at* http://www.cisg.law.pace.edu/cisg/biblio/eorsi1.html. In order to determine what material outside of the Convention may be used to define commercially reasonable substitute, Article 7(2) requires the determination of two issues. First, "[i]s the matter governed by the Convention? If not, that is the end of the inquiry as a gap can only exist in relation to matters that are governed by the Convention." Mark N. Rosenberg, *The Vienna Convention: Uniformity in Interpretation for Gap-filling – An Analysis and Application*, 445-46 *available at* http://www.cisg.law.pace.edu/cisg/biblio/rosenberg.html [hereinafter *The Vienna Convention*]. Second, "[i]f the matter is governed by the Convention, the next question is whether it is expressly settled under it. If so, a gap cannot exist as the Convention already deals with the matter." *Id.* There is scholarly commentary about provisions of Article 79 supporting the conclusion that the provision is not settled. *See, e.g.,* Joseph Lookofsky, *Walking the Article 7(2) Tightrope Between CISG and Domestic Law*, 25 JOURNAL OF LAW AND COMMERCE 87, 99-105 (2005-6) (considering the matters governed, but not settled by the CISG and specifically whether Article 79 preempts private law regarding hardship).

### (b) Interpretation within the Case Law and CISG

First, the actual language and relevant case law requires a preliminary determination of the meaning of the relevant CISG's provisions. Following this initial inquiry the "[c]onvention permits three methods which should be applied subsidiarily." Nives Povrzenic, *Interpretation and Gap-Filling under the United Nations Convention on Contracts for the International Sale of Goods*, http://www.cisg.law.pace.edu/cisg/text/gap-fill.html. First, "specific provisions by analogy[,]" second, "general principles on which the Convention is based[,]" and finally, "private international law." *Id.*

The four corners of the CISG provide little guidance as to what constitutes a commercially reasonable substitute. CISG Article 79. The general principles of the CISG provide a preference for performance and the international character and promotion of good faith. *See* CISG Article 7(1); Evelien Visser, *Gaps in the CISG* ("Overall, the aim of the CISG is to give

BOS_592507_1.DOC/PONEILL

preference to the performance remedies."). These principles do little to advance the definition of commercially reasonable substitute in present circumstances. The Secretariat Commentary to the CISG provides some illuminating guidance, stating in pertinent part that:

> Even if the non-performing party can prove that he could not reasonably have been expected to take the impediment into account at the time of the conclusion of the contract, he must also prove that he could neither have avoided the impediment nor overcome it nor avoided or overcome the consequences of the impediment. This rule reflects the policy that a party who is under an obligation to act must do all in his power to carry out his obligation and may not await events, which might later justify his non-performance. This rule also indicates that a party may be required to perform by providing what is in all the circumstances of the transaction a commercially reasonable substitute for the performance, which was required under the contract.

Secretariat Commentary, Guide to CISG Article 79, § 7.

The case law only provides limited assistance in defining "commercially reasonable substitute" under Article 79. One court held that there was no exemption where "[t]he two parties did not stipulate in the contract that the contract goods must be Hunan oranges; therefore, even though there was flood in Hunan Province, which caused a shortage of canned mandarin oranges production, it should not be a barrier for the [Seller] to get contract goods from other provinces." China, 30 November 1997 CIETAC Arbitration proceeding (*Canned oranges case*) http://cisgw3.law.pace.edu/cases/971130c1.html. Reasoning analogously to the facts of the current case, the parties to the Contracts in question did not specify whether the chicken could be shipped to Buyer at another country besides Romania; they only stated with respect to shipment to Buyer that its address was in Romania.

In order to determine if there is an applicable general principle "a uniform rule based on general principles, on which the Convention is based, should be searched for and formulated." Peter Schlechtriem, *Requirements of Application and Sphere of Applicability of the CISG*, 790 *available at* http:www//cisg.law.pace.edu/cisg/biblio/schlechtriem9.html [hereinafter *Requirements of Application*]. The problem with this formulation is that "the Convention . . . does not state [the rules] explicitly. Therefore, they have to be derived from an analysis of concrete provision so to unearth the general principles underlying them." *Id.*

The scholarly discussion provides somewhat more guidance. Chengwei Liu recommends the following approach:

> Thus, even an unforeseeable impediment exempts the non-performing party only if he can prove that he could neither avoid the impediment, nor by taking reasonable steps, overcome its consequences . . . . To "overcome" means to take the necessary steps to preclude the consequences of the impediment. It is closely associated with the condition of the external character of the impending event. In no event, however should the promisor be expected to risk his own existence by performing his obligations at all costs. What is required here is that a party who is under an obligation to act must do all *in his power* to carry out his obligation . . . . Again the yardstick used to measure the efforts of the party concerned is what can reasonably be expected from him. And that is what is customary, *or what similar*

*individuals would do in a similar situation.* The exemption is thus granted when efforts would have been necessary that go beyond the former. Thus, the basis of reference is the same as for unforeseeability, i.e., the reasonable person. In this context, with both the foreseeability condition and the unavoidability condition read together, the concept of CISG Art. 79 may be referred to as, "exonerations for events which a reasonable person in the same situation was not bound (could not be expected) to take into account or to avoid or to overcome." This reasonable criterion regarding the unavoidability requirement is, however, to a degree uncertain, because whether an event could have been reasonably avoided or its consequences overcome depends on the facts. Here again a case-by-case analysis is required. If an object is lost at sea and can be fished out in good condition although at great cost, the final solution will not be the same if the object were a highly valuable sculpture or merely a machine tool. Thus, *everything is a question of measure.*

Chengwei Liu, *Force Majeure* § 4.5. (emphasis added)

The facts of the instant case cut against the Seller in that another supplier to Buyer, Tyson, did deliver the chicken leg quarters to the Buyer in another locale. Even applying "commercial practicability" as a test for excuse (uniform comment 10 to §2-615) the shipment term was treated in fact as incidental aspect of performance despite the ban; an alternative unloading port was substituted as the destination consistent with U.C.C. § 2 –614(1). While Seller raised the prospect that its agreements with other parties made substitute performance impossible without harm to Seller through breach of its other contracts, the Seller admitted that not all markets were covered by exclusive arrangements. Thus, under this approach Seller should have explored possible alternatives in this regard with Buyer, but failed to do so to Buyer's detriment and Seller's enrichment.

### (c) Interpretation Aided by Sources Outside the Convention

If the CISG and its case law fail to provide the necessary information the next step is to look beyond that to private law. Mark N. Rosenberg, *The Vienna Convention*, 445-46. However, the CISG allows recourse to the rules of private international law "only as a last resort." John O. Honnold, Uniform Law for International Sales under the 1980 United Nations Convention, 472-495 (3d ed. 1999) *available at* http://www.cisg.law.pace.edu/cisg/biblio/ho79.html. The analysis reaches that point.

Analytic approaches of American courts have certainly included analogizing to the UCC to clarify Article 79 of the CISG. *See Delchi Carrier S.p.A. v. Rotorex Corp.*, 71 F.3d 1024, 1028 (2d Cir. 1995); *Raw Materials Inc. v. Manfred Forberich GmbH*, No. 03 C 1154, 2004 WL 1535839 (N.D. Ill., July 7, 2004); *Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, No. 01-4447, 2004 WL 116628, at *4 (N.D. Ill. May 21, 2004). One court stated: "that '[w]hile no American court has specifically interpreted or applied Article 79 of the CISG, caselaw interpreting the Uniform Commercial Code's ("U.C.C.") provision on excuse provides guidance for interpreting the CISG's excuse provision since it contains similar requirements as those set forth in Article 79'." That court then concluded that "[t]his approach of looking to caselaw interpreting analogous provisions of the UCC has been used by other federal courts". Thus, in applying the CISG, the court used "caselaw interpreting a similar provision of § 2-615 of the

UCC." *Raw Materials Inc. v. Manfred Forberich GmbH*, 2004 WL 1535839 (N.D. Ill., July 7, 2004). This approach is persuasive as the UCC contains a provision on commercially reasonable substitutes, stating in pertinent part: "[i]f without fault of either party the agreed berthing, loading, or unloading facilities fail or an agreed type of carrier becomes unavailable or the agreed manner of performance otherwise becomes commercially impracticable but a commercially reasonable substitute is available, the substitute performance must be tendered and accepted." UCC § 2-614(1).

While there are differences between the exemption provisions under CISG Article 79 and UCC § 2-615, the provisions governing substitute performance are quite similar. Carla Spivack, *Of Shrinking Sweatsuits*, 769-70. "The third requirement of Article 79, that the impediment be one that the party could not have overcome or avoided, does not appear in the text of UCC § 2-615, but finds expression in U.C.C. § 2-614 case law." *Id.* Both of the "regimes apply the reasonable person standard to determine what actions must be taken." *Id.* The relevance of using the UCC to interpret the CISG depends on whether the UCC has been interpreted in such a way that would provide more guidance than the CISG and its provisions. As one scholar put it: "where no principle can be found, gap-filling by uniform rules is impossible, and one has to revert to domestic law. [Thus], recourse to domestic law is unavoidable in most cases." Peter Schlechtriem, *Requirements of Application*.

This approach justifies invoking American case law interpreting the UCC § 2-614(1). A search for U.S. cases interpreting UCC § 2-614 revealed a fairly small number of relevant cases. *See Jon-T Chemicals, Inc. v. Freeport Chemical Co.*, 704 F.2d 1412, 1416-17 (5th Cir. 1983) (finding that substitute performance through 2-614 had no relevance where the parties provided for "the action to be taken if the agreed type carrier became unavailable."); *Fabrica Italiana Lavorazione Materie Organiche, S.A.S v. Kaiser Aluminum & Chemical Corp.*, 684 F.2d 776, 778-79 (11th Cir. 1982) (holding that Seller could not avoid the application of U.C.C. s 2-614(1) by reformulating its claim into one of proximate cause when "agreed manner of delivery otherwise becomes commercially impracticable but a commercially reasonable substitute is available, such substitute performance must be tendered and accepted"); *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957 (5th Cir. 1976); *American Trading & Production Corp. v. Shell International Marine, Ltd.*, 453 F.2d 939, 942-43 (2d Cir. 1972) (finding a commercially reasonable substitute to shipping); *Camden Iron & Metal, Inc. v. Bomar Resources, Inc.*, 719 F. Supp. 297, 309 (D.N.J. 1989) (concluding that a certain condition "rendered Camden Iron's obligation to load the vessel 'commercially impracticable.'"); *United Equities Co. v. First National City Bank*, 52 A.D. 2d 154 (N.Y. App. Div. 1976).

The evidentiary record concerning what alternative steps were commercially reasonable in the limited time availability prior to the Romanian ban taking effect focused in substantial part on: (i) the Herculean effort to load as much product as possible from the supplier Seller had been using; (ii) the labeling requirements of the Romanian market as a factor limiting the ability to divert shipments at sea to Romanian customers; (iii) the logistical challenges attendant to identifying port docking space and refrigerated container availability if alternative manufacturers with product could even be found, particularly given the limited resources and time available to search for such alternatives instead of maximizing what could be loaded in timely fashion. The record in this regard reflects a commercially reasonable effort by Seller.

BOS_592507_1.DOC/PONEILL

However, the inquiry does not end here in searching for commercially reasonable alternatives. Buyer raised the prospect of accepting delivery of the product elsewhere to make subsequent shipment possible. Another American supplier facing the same Romanian ban as Seller shipped to another port. While that particular port may not have been a viable alternative for Seller, the evidence made clear there were ports where exclusivity arrangements would not have precluded such delivery. It was Seller's duty to do so here and it failed to do so, preferring to pocket the profit available in a market experiencing a dramatic rise in prices. In doing so Seller misappropriated a profit that should have been made available to Buyer through an alternative shipment destination. The law does not countenance such a result. Accordingly, Buyer is entitled to damages as a remedy.

Article 74 of the CISG provides the applicable standard for the damages claim asserted by Buyer. Basically, under it Buyer is entitled to lost profits caused by Seller that were foreseeable at the time of entry into the Contracts The damages requested by Buyer meet the Article 74 standard and are adequately evidenced (See, e.g., Ex. 7). Seller's challenge to the damages sought, apart from a force majeure defense, is largely grounded upon the premise that market loss should not take into account a commercially reasonable phased release of product for sale. As such, Seller seeks to blur receipt of product with release of it into the market. However, there was no credible evidence on which to base that inference or to support such a finding. Seller's position is unpersuasive, and is divorced from commercial reality.

## III. Award

### A. Damages

Accordingly, damages in the full amount requested of $608,323.00 are awarded.

Pre and post-judgment interest issues relating to such damages shall be addressed in the Final Award per the Scheduling and Procedural Order that shall be made a part of this Interim Award.

### B. Cost Shifting

I find that Buyer has prevailed on claims and, in accordance with the terms of the ICDR Rules, is entitled to award of the costs (including reasonable attorneys' fees) that it incurred in connection with the prosecution of its claims in this proceeding. Such award of costs, as well as an allocation of the ICDR's administrative fees and the sole arbitrator's compensation, shall be made in the Final Award upon consideration of further written submissions by the parties pursuant to the Scheduling and Procedural Order that shall be made a part of this Interim Award.

### C. Resolution of All Issues

All of the parties' claims, counterclaims and arguments have been considered and, except as expressly granted in this Interim Award, which is in full settlement of all claims and counterclaims submitted to this arbitration, are hereby denied.

BOS_592507_1.DOC/PONEILL

SO ORDERED

I hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Interim Award was made in New York City, New York, United States of America.

_____
Philip D. O'Neill, Jr., Esq.
Sole Arbitrator

Dated: August 7, 2007

State of          Massachusetts  ⎫
                                 ⎬ SS:
County of        Suffolk         ⎭

I, Philip D. O'Neill, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

DATED: August 7, 2007

_____
Philip D. O'Neill, Jr., Esq.
Sole Arbitrator

– 12 –